UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO

In re:                                        ) In Jointly Administered
                                              ) Chapter 11 Proceedings
PHAR-MOR, INC., *et al,*                       )
                                              ) Case No. 01-44007 through 01-44015
            Debtors.                          )
                                              ) KAY WOODS
                                              ) U.S. Bankruptcy Judge

## DEBTOR'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. Pro. 56, made applicable to these proceedings pursuant to Fed.

R. Bankr. Pro. 7056, Debtors Phar-Mor Inc., et. al. (the "Debtor" or "Phar-Mor")) hereby moves

for summary judgment in its favor on the following issues relating to general unsecured and

priority administrative claims asserted against it by Giant Eagle, Inc. ("Giant Eagle") and Valu

Eagle Associates ("Valu Eagle").

Debtor asserts that there are no genuine issues of material fact and it is entitled to

judgment as a matter of law upon the matters raised in the following papers:

2.      1. Amended Application and Request For Payment of Administrative Expense

filed by Giant Eagle (the"Request & Amended Request")-Docket No. 1400

3.  Debtor's Response of Application of Giant Eagle for Payment of Administrative

Expense.-Docket No. 1091

4.  Debtor's Supplemental Response to Amended Application and Request for payment

of Administrative Expense filed by Giant Eagle.-Docket No. 1502

5.  Amended Application and Request for payment of Administrative Expense and Post

Petition Rent filed by Valu Eagle.-Docket No. 1398

6.  Debtor's Response to Application of Valu Eagle Associates for payment of

Administrative Expense and Post Petition rent filed by Phar-Mor.-Docket No. 1086

1

LAW OFFICES OF NADLER NADLER & BURDMAN CO. LPA  YOUNGSTOWN, OHIO

7. Debtor's Supplemental Response to Amended Application and Request of Valu Eagle Associates for Payment of Administrative Expense and Post Petition Rent.-Docket No. 1503

7. Amended Valu Eagle Proof of Claim.-Claim No. 88880009

8. Amended Giant Eagle Proof of Claim.-Claim No. 1922

9. Debtor's Thirteenth Omnibus Objection to Claim-Giant Eagle-Docket No. 1956

10. Debtor's Fourteenth Omnibus Objection to Claim-Valu Eagle-Docket No. 1957

11. Response of Giant Eagle, Inc. and Valu Eagle Associates to Debtor's Thirteenth and Fourteenth Omnibus Objection.-Docket Nos. 2055 and 2054

Debtor's motion is supported by the attached Memorandum In Support, the Stipulation of Facts jointly submitted by the parties, and the Seekely Affidavit annexed.

Dated: 5-19-05

<div style="margin-left:40%;">

Respectfully submitted,

/s/ Michael A. Gallo, Esq.
MICHAEL A. GALLO, ESQ.
NADLER NADLER & BURDMAN CO., LPA
20 Federal Plaza West, Suite 600
Youngstown, OH 44503
330-744-0247 PH  330-744-8690 FAX
**gallo@nnblaw.com**

</div>

## MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

## SUMMARY JUDGMENT STANDARD

Phar-Mor bears the burden of demonstrating that no genuine issues of material fact remain in dispute and that it is entitled to judgment on the Giant Eagle/Value Eagle claims as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if its resolution will affect the outcome of the lawsuit. *Martin v. Daily Express, Inc.*, 878 F. Supp. 91 (N.D. Ohio 1995). In deciding whether a fact is material, a court must confine its review to the

<div style="position:absolute; left:0; writing-mode:vertical-lr;">LAW OFFICES OF NADLER NADLER & BURDMAN CO. LPA YOUNGSTOWN, OHIO</div>

2

question of materiality. *New Jersey Life Ins. Co. v. Getz*, 622 F.2d 198 (6th Cir. 1980). In other words, a court is not to weigh credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence. *See, e.g., Barber v. General Electric Co.*, 648 F.2d 1272, 1276 (10th Cir. 1981). In this case, no issues of material fact exist and, as explained below, Phar-Mor is entitled to judgment as a matter of law on each of the issues before the court.

## BACKGROUND

The facts framing the issue before the Court are uncomplicated. Subsequent to the determination to discontinue its business operations and transfer substantially all of its assets to a consortium of liquidating agents acting in conjunction with Giant Eagle, Phar-Mor rejected its leases with both Giant Eagle and Valu Eagle (a related Giant Eagle entity)[1] for personal property which was being used by it in the operation of its warehouse facility in Austintown, Ohio. (the "Equipment Leases") The equipment which was the subject of the rejected Equipment Leases generally consisted of an extensive conveyer system and related equipment for moving inventory through the Phar-Mor warehouse. Parenthetically, it may be noted that the real property lease for the warehouse between Phar-Mor and Giant Eagle was also rejected by Phar-Mor at such time.[2]

Shortly after the rejection of the Equipment Leases both Giant Eagle and Valu Eagle entered into new leases with Synders Drug Store, Inc. ("Synders") for the same equipment at the same rental for a term which extended six years beyond the term of the rejected Phar-Mor

---

[1] See Giant Eagle/Valu Eagle Reply to Omnibus Objection in Synders Drug Stores, Inc.: Docket No. 780 at footnote number 1, "The ownership of the Equipment was divided between Giant Eagle and Valu Eagle, a related company. Because the Equipment was of the same sort and was used interchangeably by the Debtor, this Response is filed jointly".

[2] Pursuant to the Joint Stipulation submitted by the parties, the Order (A) Authorizing The Sale Of Substantially All Of The Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances; and (B) Authorizing Going Out of Business Sales (the "Sale Order") provides the primary basis for resolution of the issues now before the court. Specifically also referenced is the Agency Agreement annexed to the Sale Order.

01-44007-kw    Doc 2571    FILED 05/19/05    ENTERED 05/19/05 15:38:44    Page 3 of 19

LAW OFFICES OF NADLER NADLER & BURDMAN CO. LPA YOUNGSTOWN, OHIO

Equipment Leases (the "Mitigating Leases"). Synders also took over the operation of the warehouse formerly used by Phar-Mor pursuant to a newly executed real estate lease.

Unfortunately, within one year of execution of the Mitigating Leases, Synders was also required to seek Chapter 11 protection in a case before this Court. Among the actions taken in the course of its Chapter 11 case Synders' rejected the Mitigating Leases for the warehouse equipment as well as the underlying real property lease for the warehouse (see docket Synders Drug Store Case No.03-44577; docket entry 310).

Claims for the total rejection damage claim upon the Mitigating Leases were filed and allowed in the Synders' case and Giant Eagle and Valu Eagle have been paid the full dividend provided to general unsecured creditors pursuant to the confirmed plan in the Synders' case. Valu Eagle and Giant Eagle now seek to resurrect their damage rejection claim against Phar-Mor based upon the subsequent default of Synders upon the Mitigating Leases. Although some issue may exist with respect to the reasonableness of the disposition of the equipment which was the subject of the Mitigating Leases such should not effect the relief requested herein.

## ARGUMENT

### I. THE GENERAL UNSECURED DAMAGE REJECTION CLAIM: A LESSOR WHO FULLY MITIGATES DAMAGES BY RELETTING MAY NOT REVIVE ITS DAMAGE CLAIM AGAINST ORIGINAL LESSEE UPON DEFAULT OF MITIGATING LESSEE

The first issue before this Court is whether Phar-Mor continues to be responsible into the future with respect to the success or failure of Synders upon the Mitigating Leases, in effect making Phar-Mor some type of ill defined co-obligor, guarantor or indemnitor of such leases.

It is Phar-Mor's position that the law mandates a lessor mitigate its damages upon a rejected executory contract and that once a lessor enters into a subsequent binding contract with

4

a third party fully mitigating any damage it might otherwise assert, further liability of the prior lessee ends from and after the effective date of the new lease.

### A. The Bankruptcy Court looks to state law to determine the allowance of a lease damage rejection claim.

Unless in direct conflict with the Bankruptcy Code, a landlords future rent claim must be calculated in accordance with applicable state law. State law must be suspended only to the extent it conflicts with the Bankruptcy Code, *Butner v. United States*, 440 U.S. 48 (1979). As the Butner court stated "Even though Congress has the constitutional authority to establish uniform bankruptcy laws, it has generally left the determination of property rights and the assets of the bankruptcy estate to state law" *Id.* at 914. The principle was reiterated by the Sixth Circuit in the case *In re Highland Superstores, Inc.,* 154 F.3d 573 (6th Cir. 1998) as summarized in the courts eleventh syllabus, "a landlord's damages arising from debtor's lease rejection are determined in accordance with terms of lease and applicable state law..."

### B. Obligation to Mitigate Damages Under State Law

Prior to establishing any claim for damages arising from the rejection or breach of a contract, state law imposes the duty upon a lessor to use reasonable efforts to mitigate its damages. A landlord's duty of mitigation has been recently addressed by the Ohio Supreme Court in the case of *French Town Square v. Lemstone*, 99 Ohio St.3d (2003). In that case the court reaffirmed the obligation of mitigation imposed upon a lessor after its lessee's breach. The court stated, "under the common law of contracts, mitigation is a fundamental tenet of damage calculus. Contracts are the mutual exchange of promises, with each party holding an expectation of certain obligations and benefits. Thus, contract law acknowledges that mitigation, otherwise known as the doctrine of avoidable consequences, may justly place an injured party in as good a position had the contract not been breached at the least cost of the defaulting party." *Id.* at 257.

5

Similarly Pennsylvania law imposes the requirement that a lessor mitigate its prospective damages. In the case *In re Paskorz,* 284 B.R. 429 (Bankr. W.D. Pennsylvania 2002), analyzing language similar to that set forth in the Valu Eagle/Giant Eagle leases the court wrote that even if the parties had not agreed to mitigation of damages under the lease, lessor's obligation to mitigate damages would still exist. *Id.* at 431. Similarly, in the case *In re New York City Shoes, Inc.,* 86 B.R. 420 (Bankr. E.D. Pennsylvania 1988) the court reaffirmed the fact that a lessor is not entitled to recover damages it could have avoided with reasonable efforts.

Notwithstanding the clear duty of mitigation imposed upon a landlord under state law should there be any question with respect to the issue it is clearly resolved by the contractual agreement between the parties. Paragraph 17 of the Amended and Restated Master Lease Agreement for both leases provides as follows:

> ...in the event lessor terminates any lease schedule or any equipment is otherwise returned to lessor, lessor shall mitigate damages by selling, re-leasing or otherwise disposing of such equipment in commercially reasonable manner.

That Giant Eagle and Valu Eagle were under duties to mitigate both by virtue of state law and the contractual relationship between them is beyond argument. To have the duty to mitigate and then to attempt to disregard the results of that mitigation because of what may happen in the indefinite future creates an anomalous situation.

**C. The Effect on Rejection claim of a lessor who has fully mitigated damages by virtue of entering into a subsequent mitigating contract**

On October 1, 2002 Valu Eagle and Giant Eagle entered into a binding legal contract with Synders Drug Stores. The contract provided for payment of the full amount of that which they would have otherwise received pursuant to the rejected Phar-Mor leases. At that point in time the contractual obligation due Giant Eagle and Valu Eagle from Synders was fully mitigated

LAW OFFICES OF NADLER NADLER & BURDMAN CO. LPA YOUNGSTOWN, OHIO

6

and satisfied any ongoing liability which would have otherwise existed by virtue of the rejection of the leases by Phar-Mor.

A basic tenet of contract law provides that the purpose of mitigation is to place the lessor in as good of a position as it occupied prior to rejection. *Knapp, Commercial Damages* § 1.02 [1], at 1-2.1 (1991). Prior to rejection Giant Eagle/Valu Eagle enjoyed a right to enforce a contract against Phar-Mor. After mitigation it enjoyed the same, albeit expanded right against Synyder (due to longer term). To suggest that after mitigation Giant Eagle/Valu Eagle had the right to multiple party recoveries, e.g. against both Phar-Mor and Synders effectively places them in a better position than occupied prior to breach.

Giant Eagle and Valu Eagle made a determination that a credit worthy, responsible, contracting party would be accepted as the entity obligated for the ongoing stream of rental payments. Clearly, debtor was not a signator to the Mitigating Leases with Synders. Clearly, debtor was not a co-obligor, guarantor, or indemnitor upon the Mitigating Leases. Perhaps the best summary of the nature and extent of liability of a lessor upon a lease which has been breached is that set forth by the Ohio Supreme Court in the case *Dennis et. al. v. Morgan*, 89 Ohio St. 417 (2000). The court acknowledging the fact that the extent of a lessee's liability remains in doubt after termination, goes on to specifically state:

> Lessee's are potentially liable for rents coming due under the agreement as long as the property remains unrented. The important corollary to that is that landlords have a duty, as all parties to contracts do, to mitigate their damages caused by a breach. ...if the lessor has acted reasonably in attempting to secure a new tenant the lessee is liable for the rent up to the point of the lessors finding a new tenant or the expiration of the lease, which ever is earlier. *Id.* at 419. (emphasis supplied)

The effect of a lessor mitigating its damages by reletting and the termination of liability by the prior lessee from and after such reletting is so solidly entrenched both as a matter of law

LAW OFFICES OF NADLER NADLER & BURDMAN CO. LPA YOUNGSTOWN, OHIO

7

and of common sense that counsel is unable to discover any cases even addressing circumstances wherein a lessor attempted to revive its claim against an original lessee after default by the subsequent mitigating lessee. One can only glean from the myriad number of cases which address circumstances in which a hypothetical relet value is established to ascertain an appropriate damage rejection claim, that once reletting occurs the original lessee is no longer at risk.

Numerous cases impose the reduction or elimination of a damage rejection claim based upon credible evidence with respect to a <u>hypothetical</u> relet value. These cases provide the lessee a presumption of mitigation as a credit against a rejection damage claim, even in the absence of an actual reletting. For example cases determining the amount of an allowed claim for lease rejection damages in the bankruptcy context have imposed a reasonable rental value of the leased property for the remaining term of the terminated lease, less anticipated cost and delay in obtaining such new rental. See *In re Merry-go-round Enterprises*, 241 B.R. 124 (Bankr. Maryland 1999) stating:

> If Trustee meets her initial burden, she additionally will have a presumption that the Landlord could have relet the premises for the amount of the reserved rent, without loss. *See Palmer v. Connecticut Ry. & Lighting Co.*, 311 U.S. 544, 61 S.Ct. 379, 85 L.Ed. 336 (1941); *In re D.H. Overmyer Co., Inc. (Ohio) v. Irving Trust Co.*, 60 B.R. 391, 395 (S.D.N.Y. 1986). A Landlord may overcome this presumption by showing that it was not able to relet the premises for at least the amount of the reserved rent. *See Overmyer*, 60 B.R. at 395. If a Landlord is not able to make such a showing at an evidentiary hearing, its claim must be disallowed. *Id.* at 134

The concept is reinforced by the court in the case *In re Steiner*, 50 B.R. 181 (Bankr. N.D. Ohio) where the court addressing a lessees damage rejection claim determined damages would be the difference between the rent that would have been paid under the lease and the estimated market rental value at the time and place of rejection.

8

LAW OFFICES OF NADLER NADLER & BURDMAN CO. LPA YOUNGSTOWN, OHIO

If in situations in which a debtor is able to enjoy a presumption that the landlord could have relet the premises for the amount of the reserved rent without loss, then certainly the actual relet value as evidenced by the Mitigating Leases should establish with finality the outside parameter for the rejection claims of Giant Eagle and Valu Eagle.

**D. Valu Eagle/Giant Eagle are judicially estopped from asserting a damage claim in both the Synders and Phar-Mor cases.**

As significantly a second independent basis exists for the denial of the Giant Eagle/Valu Eagle claims. Giant Eagle/Valu Eagle filed proofs of claims in the Synders case for lease rejection damages which included the same months and amounts which are covered by the claim now before the court. In their proof of claim they asserted damages for the full amount of the monthly rentals coming due over the remaining life of the Mitigating Leases, a period which was co-extensive with the Phar-Mor leases. As a result of their choice of action in the Snyders case (although Phar-Mor believes it was the only remedy truly available to them) they are judicially estopped from asserting a second entitlement to be fully compensated for the same period against Phar-Mor for rejection of the Equipment Leases. The fortuity of the dividend which was provided in the Synders case cannot alter their entitlement to recover the same monthly amount for the same period as being demanded from Phar-Mor.

To adopt the Giant Eagle/Valu Eagle position defining their claim under §502 of the Bankruptcy Code, based upon the amount of the Snyder dividend introduces a random external factor to the Phar-Mor claims allowance process which would fly directly against the admonition of the Sixth Circuit in the case *In re Vause et. al.*, 886 Fed.2d 794 (6th Cir. 1989) wherein the court states that "statutes should be interpreted to avoid untenable distinctions and unreasonable results.

By claiming a right to full damages in the Snyders case they implicitly acknowledged the effect of the Mitigating Leases. The doctrine of judicial estoppel bars a party from asserting a position that is contrary to one the party has asserted under oath in a prior proceeding, where the prior court adopted the contrary position "either as a preliminary matter or as part of a final disposition." *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir.1990). Judicial estoppel is an "equitable doctrine meant to preserve the integrity of the courts by preventing a party from …achieving success on the position, then arguing the opposite to suit an exigency of the moment." *Id.* It is unquestionable that had the within Giant Eagle/Valu Eagle claim come before the court prior to the filing of the Snyders' case, the rejection claim now at issue would be a moot point. Similarly if the Snyders dividend had been other than as established the issues now before the court would be altered.

**II.   THE ADMINISTRATIVE CLAIM ISSUE:   GIANT EAGLE AND VALU EAGLE ARE NOT ENTITLED TO AN ADMINISTRATIVE CLAIM FOR THE PERIOD SUBSEQUENT TO ENTRY OF THE ORDER AUTHORIZING THE SALE OF PHAR-MOR; WAREHOUSE INVENTORY BECAUSE THE LEASED EQUIPMENT WAS EFFECTIVELY RETURNED TO GIANT EAGLE AND ITS PRIMARY USE WAS FOR THE BENEFIT OF GIANT EAGLE AND THE AGENT**

**A. § 365(d)(10) Affords The Court Discretion To Deny Administrative Claims**

A separate dispute exists with respect to the Giant Eagle and Valu Eagle Administrative Claims. Subsequent to the entry of the Sale Order any use of the Leased Equipment was for the primary benefit of Giant Eagle and the Agent. This provides the court the discretion, pursuant to § 365(d)(10), to determine that Giant Eagle/Valu Eagle are not entitled to an administrative claim from and after the sale date.

Subsequent to the determination that Phar-Mor was no longer able to continue regular business operations a decision was made to conduct an orderly liquidation of all its business

LAW OFFICES OF NADLER NADLER & BURDMAN CO. LPA   YOUNGSTOWN, OHIO

10

assets including all of its inventory in the Austintown warehouse. Toward this end Debtor ultimately engaged the services of a liquidating Agent. The Agency Agreement annexed to the Sale Order identified the Agent as follows.

> This Agency Agreement (this "Agreement") is made and entered into as of this day of July, 2002, by and between a joint venture composed of Hilco Merchant Resources, LLC and The Ozer Group LLC (the "Agent") working in conjunction with Giant Eagle, Inc. ("Giant Eagle")... on the one hand, and PHAR-MOR, Inc. an Ohio corporation, it debtor affiliates and their respective chapter 11 estates (jointly and severally, the "Merchant"), on the other hand.
> (Agency Agreement p. 1, Paragraph 1)

The relevance of Giant Eagle's role and participation with the Agent as the purchaser of a majority of Debtor's warehouse inventory is essential to resolution of the second issue before the court. The Sale Order included the immediate transfer to Giant Eagle and the Agents of substantially all Debtor's inventory in the Austintown Warehouse where the Leased Equipment was being used. Giant Eagle in conjunction with the Agent became owners of the inventory on the Closing Date of the Sale Order. As provided in the Agency Agreement at paragraph 5.4:

> On the Closing Date, without further order of the Bankruptcy Court, Merchant shall transfer all right, title and interest of Merchant to Giant Eagle or any of Giant Eagle's designees the following Assets:...

> (b) all inventory (other than Private Label Inventory) located at the Warehouse;...

> (d) to the extent owned and transferable, any furniture, fixtures, leasehold improvements and equipment, including computer software and hardware located at the Warehouse and the GE Stores.

Giant Eagle purchased all non Private Label Inventory in the warehouse immediately at Closing, with the Agent purchasing the remaining Private Label Inventory. Although one could argue whether or not Phar-Mor's ownership of the lease for the warehouse equipment is within the category of items transferred to Giant Eagle in sub-section (d) above, what is inescable is the

11

LAW OFFICES OF NADLER NADLER & BURDMAN CO. LPA  YOUNGSTOWN, OHIO

parties clear intentions with respect to the transfer and acceptance by Giant Eagle of all Phar-Mor related assets located in the warehouse.

The Agency Agreement then continues to reference the estimated value of each portion of inventory going to each at Section 4.5 of the Agency Agreement

> The parties hereto have agreed upon the Guaranteed Amount (of the Purchase Price) based upon the assumption that as of the Closing Date, Merchant shall have, on a Cost Value basis…(ii) $17.4 million of inventory (other than private label inventory) ("Non-Private Label Inventory") located in the Warehouse; (iii) $1.6 million of private label inventory ("Private Label Inventory") located in the Warehouse…[3]

To assert that Phar-Mor must pay for the Leased Equipment which was utilized to handle over Thirteen Million Dollars ($13,000,000.00) of Giant Eagle's own inventory and to assist Giant Eagle in dividing the warehouse inventory purchases in conjunction with the Agent certainly raises the specter of inequity.

At this juncture it becomes critical to focus on the very significant distinction between the claims of a lessor of real property and those of a lessor of personal property. Section 365(d)(10) contains a specific provision not contained at § 365(d)(3). § 365(d)(10) provides:

> The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(d)(2), first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for persona, family or household purposes), until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, <u>unless the court, after notice and hearing and based on the equities of the case, orders otherwise</u> with respect to the obligations under the provisions of subsection (b) or (f). Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title. (emphasis supplied)

This discretion vested with the Court to determine whether a lessor is entitled to an administrative claim based on the equities of the case does not appear in § 365(d)(3) relating to

---

[3] See Seekley Affidavit Exhibit A attached wherein the specific amount of the warehouse inventory purchased by Giant Eagle and the Agent after conclusion of the post sale inventory conducted by RGIS Inventory Services is as follows; Giant Eagle purchased inventory $13,187,000.00; Agent purchased Inventory $6,075,000.00; Phar-Mor remaining obsolete inventory and supplies $844,000.00.

12

LAW OFFICES OF NADLER NADLER & BURDMAN CO. LPA YOUNGSTOWN, OHIO

real property leases. The cases interpreting subsection § 365(d)(10) address the very circumstances before this court, that being whether or not there was a benefit to debtor's estate by virtue of its utilization of the leased equipment prior to formal rejection of the lease and if so the extent of such benefit.

Less than ten percent (10%) of the total warehouse inventory, consisting of Phar-Mor's miscellaneous supplies and obsolete inventory remained in the warehouse after the sale, while Giant Eagle and the liquidating agents determined what portion of the remaining Nineteen Million Dollars ($19,000,000.00) of inventory was to go to each. The Leased Equipment's primary use was for the benefit of Giant Eagle and the Agent. Perhaps the clearest indication of the parties' intentions with respect to the very issue before the court as to payment of warehouse expenses after entry of the Sale Order is established in the Agency Agreement itself at paragraph 7.1:

> Agent shall be responsible for and shall pay from the Sale Proceeds all Expenses incurred in conducting the Sale. "Expenses" are limited to the following:…(1) any costs or expenses associated with the Warehouse from and after the Closing Date.

The inequity of Phar-Mor paying lease payments on equipment used for the benefit of Giant Eagle, in addition to being addressed in the Agency Agreement, provides meaning to the exclusionary provisions of § 365(d)(10). At best Giant Eagle's claim for this period of time is to be settled between Giant Eagle and the Agent with whom it was acting in conjunction.

### B. Giant Eagle's actions constitute a constructive termination of Leased Contract

A second basis exists to disallow the administrative claim of Giant Eagle. The actions of Giant Eagle as a purchaser of the warehouse inventory and the "transfer (of) all right, title and interest of Merchant to Giant Eagle…" of the following asset "leasehold improvements and equipment" created a situation in which Giant Eagle constructively, if not actually, reclaimed the

13

LAW OFFICES OF NADLER NADLER & BURDMAN CO. LPA   YOUNGSTOWN, OHIO

Leased Equipment for its benefit and the benefit of the Agent from the Closing Date of the Court

approved sale.

Another provision of the Sale Order is informative in this regard and that provision

relates to the disposition of the warehouse lease itself as follows:

> The lease covering the Warehouse is hereby deemed, effective as of the Closing
> Date, to be rejected pursuant to Section 365 of the Bankruptcy Code <u>and the
> Debtors are hereby ordered to turn over possession and use of the Warehouse to
> Giant Eagle as of such effective date</u>, and the Landlord and the Creditors
> Committee consent to the rejection as of the effective date and waive any notice
> procedures or requirements under the Bankruptcy Code or Bankruptcy Rules
> relating to the rejection of the Warehouse Lease. (emphasis supplied)
> (Order Paragraph 27)

Immediately upon the Closing Date Phar-Mor no longer had rights to the real property

where the Leased Equipment was located. Use of the warehouse and everything in it was under

the exclusive control of Giant Eagle.

As with any lessor-lessee relationship the lessor's actions can effect its entitlement to

prospective damages. As stated at 49 Am.Jur.2d...*Landlord and Tenant*, § 243, at 234 (1995)

Acceptance of a tenant's abandonment may be discerned from express acceptance by the

landlord, or through acts or conduct clearly indicating an intent to accept abandonment. *Id.* at

§235.

Applying State law the effect of the acceptance of a return of leased property as resulting

in a termination of a lessee's prospective liability is fortified. As noted by the court in the case

*Frank Nero Auto Lease Inc. v. Townsend*, 64 Ohio App.2d 65, " this court holds that where a

motor vehicle is repossessed the obligation to pay unaccrued rent is terminated" *Id.* 69. This

case law is as well consistent to the codification of a lessor's claims at O.R.C. § 1310.69 which

provides

14

LAW OFFICES OF NADLER NADLER & BURDMAN CO. LPA  YOUNGSTOWN, OHIO

(A) If a lessee...repudiates ...the lessee is in default under the lease contract, and the lessor may do one or more of the following:...

...(A)(5) Dispose of the goods and recover damages as provided in section 1310.73 of the Revised Code, <u>retain the goods and recover damages as provided in section 1310.74 of the Revised Code</u>, or in a proper case recover rent as provided in section 1310.75 of the Revised Code. (emphasis supplied)

§ 1310.74 then provides

(A)(1) Accrued and unpaid rent as of the date of default, if the lessee has never taken possession of the goods or, if the lessee has taken possession of the goods, <u>as of the date the lessor repossesses the goods or an earlier date on which the lessee makes a tender of the goods to the lessor</u>. (emphasis supplied)

Giant Eagles actions subsequent to entry of the Sale Order are not unlike those which were before the court in the case *In re Steven Windsor, Inc.*, 201 B.R. 133(Bankr. D. Md. 1996) in which a lessor used leased premises for its own benefit after surrender by the lessee. The <u>Steven Windsor</u> court noted "...if he (lessor) elects to re-enter, his reentry is deemed an acceptance of the tenant's surrender, and the lease is considered terminated by the mutual agreement of the parties. *See* Annot., 13 L.R.A. 398 (1908)"*Id.* at 136. It then continues: "... a landlord's re-entry into the premises and utilization of the premises for its own purposes is sufficient to constitute an implied acceptance of the tenant's abandonment thereby terminating the debtor's liability under the lease." *Id.* at 137.

Similarly the court in the case *In re D.M. Kaye & Sons Transportation, Inc.*, 259 B.R. 114 (Bankr. D. S.C. 2001) when addressing a situation involving the return of tractors by a lessee prior to formal lease rejection determined that a de facto rejection took place at the time the lessor obtained the tractors return for purposes of computing lease obligations pursuant to §365(d)(10).

15

Giant Eagle's actions in assuming control of the warehouse and Leased Equipment inside must deprive them of the right to both enjoy the privilege of using the equipment while at the same time being paid for its use.

## C. § 365(d)(10) does not mandate Administrative Statutes.

The disallowance of the Giant Eagle administrative claims is further supported by the interpretation of § 365(d)(10) by Judge Hughes in the case *In re Palace Quality Services Industries Inc.*, 283 B.R. 868 (Bankr. E.D. Michigan, 2002), wherein the court determined that § 365(d)(10) was not a provision establishing priority but rather was a remedial provision only, which enabled a lessor who was not being paid the right to reclaim its property and/or to require a Debtor to accelerate its decision to assume or reject the contract. As stated by the court:

> It is clear at least to me that Congress, when it enacted Section 365(d)(3) and Section 365(d)(10), did not choose the imposition of an administrative claim for actual rents due as the remedy for a trustee's failure to pay a commercial landlord post-petition rents when due. The remedy which Congress chose was nothing short of the estate losing the right to assume the unexpired lease and the attendant right of the landlord to seek relief from the automatic stay to recover possession of the subject property.
> *Id.* at 878.

Under *Palace Quality*, § 365(d)(10) grants neither superpriority nor administrative expense priority status to an aggrieved lessor's claim. In its holding, the *Palace Quality* court concluded that: "The debtor-in-possession's...defaults under Section 365(d)(10) did not give [the aggrieved lessor] a right independent of Section 503(b)(1)(A) to recover the unpaid rent from the bankruptcy estate." *Id.* at 905. If such lessor is to have a priority claim, the pre-rejection claim must qualify as an administrative expense independently under § 503(b)(1)(A)- in other words, there must be a benefit to the estate represented by the claim.

Under the present facts, the Leased Equipment did not confer any benefit to the estate such that Lease payments can be interpreted to be actual and necessary costs and expenses of

LAW OFFICES OF NADLER NADLER & BURDMAN CO. LPA  YOUNGSTOWN, OHIO

16

preserving the Debtors' estates, and thus entitled to priority under § 503(b)(1)(A).  To the contrary, the Debtors neither used nor possessed the Leased Equipment in any way following the entry of the Sale Order.  The Leased Equipment conferred no cognizable benefit to the Debtors' estates.  Accordingly, Giant Eagle is not entitled to an administrative expense claim for pre-rejection rents under the Lease.

## CONCLUSION

Based upon the foregoing Phar-Mor does not believe there are any disputed issues of fact with respect to the resolution of the issue as to the disallowance of the damage rejection claim of Giant Eagle/Valu Eagle.  Phar-Mor further assets that the administrative claim of Giant Eagle/Valu Eagle for the various reasons set forth above and most specifically the plain and unambiguous language of the Sale Order and Agency Agreement warrants disallowance of same.

Dated: 5-19-05

Respectfully submitted,

/s/ Michael A. Gallo, Esq.
MICHAEL A. GALLO, ESQ.
NADLER NADLER & BURDMAN CO., LPA
20 Federal Plaza West, Suite 600
Youngstown, OH 44503
330-744-0247 PH  330-744-8690 FAX
gallo@nnblaw.com

17

## CERTIFICATE OF SERVICE

A copy of the within Debtor's Motion for Summary Judgment has been served by regular

United States mail, postage prepaid, this 19th day of May, 2005, upon the following:

Darlene M. Nowak, Esq.
Marcus & Shapira LLP
One Oxford Centre, 35th Floor
301 Grant Street
Pittsburgh, PA 15219-6401

NADLER, NADLER & BURDMAN CO., LPA
20 Federal Plaza West
Suite 600
Youngstown, OH 44503
(330-) 744-0247

By:/s/ Jennifer R. Rosenberger
Jennifer R. Rosenberger, Assistant

LAW OFFICES OF NADLER NADLER & BURDMAN CO. LPA  YOUNGSTOWN, OHIO

18

STATE OF OHIO )
 ) SS: AFFIDAVIT
COUNTY OF MAHONING )

NOW COMES Martin Seekely and being first duly sworn, deposes and says:

1. I am the Chief Financial Officer (CFO) and Vice President of Phar-Mor Inc. and have served in this capacity continuously since 2000.

2. I am personally familiar with the financial affairs of Phar-Mor and have been in charge of, maintained and supervised the company's books and records under my direct care, custody and control since 1993.

3. One of my duties as CFO was to maintain in detail all financial records with respect to the Debtor's inventory and supplies located at the Phar-Mor Austintown warehouse facility.

4. Subsequent to entry of the order by the Bankruptcy Court authorizing Phar-Mor to sell the inventory located in the Austintown warehouse facility, Phar-Mor received, pursuant to the Agency Agreement an inventory reconciliation establishing the final values of the inventory in the warehouse as follows:

   a. Goods purchased by Giant Eagle -$13,187,000.00;
   b. Goods purchased by Agent-$6,075,000.00;
   c. Phar-Mor supplies and seasonal goods-$844,000.00

5. The inventory reconciliation referenced above are maintained as part of the business records kept by Phar-Mor in the ordinary course of its business.

6. Affiant further sayeth naught.

MARTIN SEEKELY

SWORN TO BEFORE ME and subscribed in my presence this 18th day of May, 2005.

NOTARY PUBLIC

CARRIE S. BARNES, Notary Public
State of Ohio
My Commission Expires June 8, 2008